UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF ALASKA

In re:

DANIEL I. GRIFFIN,

        Debtor.

Case No. 13-00574-GS
Chapter 7

### MEMORANDUM ON UNITED STATES
### TRUSTEE'S MOTION TO DISMISS[1]

The United States Trustee's *Motion to Dismiss* ("*Motion*") came before the court for hearing on July 10, 2014. Thomas Buford appeared on behalf of the United States Trustee ("UST"). Jason Crawford appeared for the debtor, Daniel L. Griffin ("Debtor"). The court heard evidence, and after oral argument was presented, the matter was taken under submission. For the reasons stated below, I find that abuse exists, warranting dismissal under § 707(b)(3), unless Debtor elects to convert this case to chapter 13.

### FACTS

Debtor filed his chapter 7 petition on December 31, 2013. At the time of the bankruptcy filing, he was employed as a car salesman in Fairbanks, Alaska. Debtor's *Amended Schedule I* details his current monthly income. It shows $7,000 in gross monthly income from his employment with Seekins Ford, and calculates his payroll deductions at $1,500. Debtor adds $150 per month to account for the monthly average attributable to his,

---

[1] In this *Memorandum*, all references to "Section" or "§" are to provisions of the Bankruptcy Code, 11 U.S.C. §§ 101-1532, unless otherwise indicated. All references to "Rule" are to the Federal Rules of Bankruptcy Procedure, and all references to "ECF No." are to the numbers assigned to the documents filed in the case as they appear on the docket maintained by the clerk of the court.

and his wife's, Alaska permanent fund dividends. In all, Debtor shows net monthly income of $5,650.

Debtor's *Amended Schedule J* reflects total monthly expenses of $5,617, leaving him with projected monthly net disposable income of $33. Debtor discloses a non-filing spouse, and identifies his stepson as a dependent living with him. His wife did not file for bankruptcy, and was unemployed when the petition was filed. During the hearing, Debtor disclosed that he and his wife were separated, and that they filed a petition for dissolution in February of 2013. He testified that the dissolution had not yet been finalized, however. His wife no longer lives with him, and makes no contribution to Debtor's household expenses. His stepson, who has not been formally adopted, does spend weekends with Debtor, though.[2]

During the hearing, Debtor testified that he helps his wife out by making her car payments and paying her between $400 and $500 per month to help with expenses. He also pays for his stepson's school and summer daycare expenses. No court order has been entered that obligates him to make these payments. He said he and his wife were just trying to work things out to keep the family together "as best we can." While Debtor included his estranged wife in his income calculations under *Amended Schedule I*, and lists his stepson as a dependent, it is unclear from the evidence whether *Amended Schedule J* reflects Debtor's post-separation expenses. His listed expenses include two vehicle payments, consistent with

---

[2] As an initial matter, the court is at a loss as to how to treat the dissolution which, according to Debtor, was filed well before the bankruptcy. Yet, Debtor filed his bankruptcy based on a three-person household. No evidence was given as to when his wife and stepson moved out of the household. And, while Debtor testified that he continues to see his stepson, there is no custody order. The question arises as to whether Debtor should, in fact, be considered as a household of one. Moreover, the dissolution may well have imposed obligations that substantially affect Debtor's finances, but no evidence was presented at the hearing on this point.

2

Debtor's testimony that he is paying for both his and his wife's cars, but there are no entries for his stepson's school or daycare expenses, or the monthly support he is voluntarily paying to his wife.

The UST filed its *Motion to Dismiss* on April 7, 2014. Because Debtor "passed" the means test, based upon his income when measured against the median income for a family of three, abuse is not presumed under § 707(b)(1) and (2). The UST instead seeks dismissal pursuant to § 707(b)(3) for abuse under a totality of the circumstances. Simply put, the UST believes that Debtor has understated his future income, and has the ability to substantially pay his creditors. Debtor challenges these contentions.

## The UST's Calculation of Income and Expenses

### A. Calculation of Monthly Net Income.

The UST argues that Debtor has understated his income based upon its review of his tax returns and pay advices. Debtor filed a joint federal return with his wife for the 2013 tax year. This return shows $110,408 in gross income for the year. At the hearing, Debtor testified that a portion of this income was attributable to his wife's earnings. His recollection was that he had earned about $93,000 in 2013, and his wife had earned approximately $17,000.[3] His Statement of Financial Affairs is consistent with his testimony, showing that he earned $89,052 from Seekins Ford in 2013. It also reflects that Debtor earned $41,015 and $22,957 from Seekins Ford in 2012 and 2011, respectively.

---

[3] Debtor testified that he had worked at Seekins Ford for about two years, and that his wife had worked for a portion of 2013. She was unemployed when the petition was filed, however, and makes no financial contribution to Debtor's household.

3

At the hearing, Martha Van Draanen, an analyst for the UST, testified regarding her review of Debtor's finances. She obtained Debtor's pay records for the 17 months, or 34 pay periods, prior to the hearing, ranging from January 2013 through May 2014. Over that period, Debtor averaged $7,687 in gross monthly wages.[4] The UST agrees with Debtor that $150 per month should be added for the Alaska permanent fund dividend, averaged over 12 months. Thus, the UST would adjust Debtor's gross monthly income from $7,000 to $7,837.

The UST also challenged Debtor's monthly payroll deduction of $1,500, noting that it was unusual for any payroll deduction to be for such an even amount. Ms. Van Draanen testified that she calculated a more appropriate payroll deduction based upon Debtor's 2013 tax return. Even with the higher gross monthly wage amount of $7,687, she calculated that the payroll deduction should be reduced by $195 to $1,305 per month. Subtracting this sum from the UST's adjusted gross monthly income amount of $7,837 yields net monthly income of $6,532, which is $882 more than the net monthly income amount reflected on Debtor's *Amended Schedule I*.

Debtor challenges the UST's upward adjustment of his projected future income. Specifically, he testified that sales projections he has received from his employer indicate that vehicle sales would decline over 2014. He pointed to his gross income for the first three months of 2014 as further evidence of a decline in sales, and a commensurate decline in his monthly income. Between January and March, 2014, Debtor's gross monthly earnings averaged less than he anticipated: $6,003.35 per month. However, when the additional two

---

[4] The same pay records reflect that Debtor earned a total of $95,934.44 in 2013, yielding an average monthly gross income of $7,994.54 for that year.

4

months of pay records for April and May 2014 are included in the calculation, Debtor's gross earnings totaled $34,758.97, for a monthly average of $6,951.79. This is roughly $49 less than the projected monthly gross wage amount of $7,000 Debtor listed on his *Amended Schedule I*.

### B.  Calculation of Monthly Expenses.

The UST generally accepts Debtor's calculation of monthly expenses. The lone dispute involves the monthly payments for two vehicles. Debtor purchased new vehicles for himself and his wife on July 30, 2013,[5] five months prior to his bankruptcy filing, and five months after they had separated, according to Debtor's testimony. When the petition was filed, Debtor was paying $883 per month for his 2013 Ford F150, and $571 per month for his wife's 2013 Buick Verano.[6]

When asked about the recent vehicle purchases, Debtor explained that the loan on his wife's prior vehicle had accrued annual interest at the "astronomical rate" of 26%.[7] With the purchase of the Verano, he was able to reduce the interest rate to 15.25%, while increasing the monthly loan payment by just $40 per month. Debtor further testified that his prior vehicle, a 2010 Dodge Ram, had required some mechanical work, and he took

---

[5] The actual purchase dates are found on the "Closed-End Note, Disclosure, Loan and Security Agreements" attached to the *Reaffirmation Agreements* filed in this case. *See* ECF Nos. 20, 21. The *Reaffirmation Agreements* were not submitted as exhibits at the hearing. The court exercises its discretion to take judicial notice of the four *Reaffirmation Agreements* on the docket relating to the vehicles.

[6] For reasons that are not clear from the record, Debtor understated his monthly vehicle payments on his *Schedule J* and *Amended Schedule J* by $42. His *Amended Schedule J* listed vehicle payments of $800 and $612, for a total of $1,412. The court notes that, had Debtor had listed the correct amounts for his vehicle payments, his schedules would have reflected negative monthly net income of $9.00.

[7] It is not clear whether Debtor was obligated on the prior vehicle loan.

5

advantage of a year-end deal to trade it in on a 2013 Ford F150. Both loans were financed through Credit Union 1. Debtor testified that the credit union had initially told him it would further reduce the interest rate on the loans if he made the monthly payments for the first six months on time. However, the credit union declined to do this after Debtor separated from his wife, because he began to struggle with debt and his credit score suffered.

Debtor has reaffirmed both vehicle loans, although he uses only the Ford F150.[8] The credit union has, post-petition, reduced the applicable interest rate on the two loans, as evidenced by the *Reaffirmation Agreements* that have been filed in this case. Two were originally filed on April 12, 2014, one for the F150 and the other for the Verano.[9] Both reflect applicable interest rates of 15.25%. Debtor filed amended *Reaffirmation Agreements* for the two vehicle loans with Credit Union 1 on May 15, 2014.[10] Both *Agreements* reflect a change in the interest rate from 15.25% to 5.00%, and state reduced loan balances. The amended *Agreement* for the F150 also reflects that the monthly loan payment was reduced by $285.15, from $883.00 to $597.85.[11]

The amended *Agreement* for the Verano states a reaffirmed amount of $25,499.42, to bear interest at 5.00% per annum, but does not disclose a change in monthly payments.[12]

---

[8] Because Debtor was represented by counsel a reaffirmation hearing was not required for these *Agreements*. 11 U.S.C. § 524(c), (m)(2).

[9] ECF Nos. 20, 21.

[10] ECF Nos. 36, 37.

[11] *Compare Reaffirmation Agreement*, ECF No. 21 at 2, with *Amended Reaffirmation Agreement*, ECF No. 37 at 2.

[12] ECF No. 36.

This *Agreement* was signed by a representative of the credit union on May 1, 2014. The prior *Agreement* for the Verano, signed by a representative of the credit union on January 8, 2014, indicated that the remaining loan term was 80 months.[13] Four months elapsed between the time the credit union signed the initial and amended *Agreements* on the Verano, and Debtor testified that he had been making the regular monthly payments on both loans. From this, the court will assume that 76 monthly payments remained on the Verano loan when the amended *Reaffirmation Agreement* was entered. Based on this assumption, the court calculates that the monthly loan payment on the Verano is approximately $392, a decrease of $179.00.[14]

The UST argues that the court should apply the reduced vehicle payments when considering the totality of the circumstances of Debtor's financial situation for the purpose of determining abuse under § 707(b)(3)(B). It urges the court to use the reduced monthly payment of $597.85 for Debtor's F150, and the $571 monthly payment for the Verano. However, as explained above, the $571 Verano payment is overstated because it is based upon the 15.25% annual interest rate. Both vehicle loans now bear a reduced interest rate of 5%, and it is reasonable to assume a reduced monthly payment of $392.00 for the Verano. As a result of the more favorable interest rate on both vehicle loans, and the resulting decrease in monthly payments, Debtor's overall monthly expenses have been reduced by roughly $422.

---

[13] ECF No. 20.

[14] This calculation was made with the Bankrate Auto Loan Calculator found at: www.bankrate.com/calculators/auto.

## C. Calculation of Monthly Disposable Income.

With the foregoing adjustments in Debtor's monthly income and expenses, the UST argues that Debtor has over $1,300 in monthly disposable income to fund a chapter 13 plan:[15]

|  | Debtor | Adjusted |
|---|---|---|
| **Gross Monthly Income** | | |
| Wages | $ 7,000.00 | $ 7,687.00 |
| Alaska PFD | $ 150.00 | $ 150.00 |
| **Payroll Deductions** | $ (1,500.00) | $ (1,305.00) |
| **Net Monthly Income** | $ 5,650.00 | $ 6,532.00 |
| **Monthly Expenses** | $ (5,617.00) | $ (5,195.00) |
| **Net Monthly Disposable Inc.** | $ 33.00 | $ 1,337.00 |

Debtor's schedules reflect that he had $43,122 in general unsecured debt as of the date of his bankruptcy filing. After recalculating Debtor's net disposable income, the UST argues that he is able to pay all his creditors in full over a five year plan.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. §§ 1334(b) and 157(b)(2)(A).

## ANALYSIS

"Where the presumption of abuse does not arise under the means test, § 707(b)(2), a bankruptcy court is directed to ('shall') determine if grounds for dismissal for abuse exist under § 707(b)(3)(B)."[16] To determine whether abuse exists under § 707(b)(3)(B), bankruptcy courts must consider: (1) whether the petition was filed in bad faith, or (2) the

---

[15] These calculations are made using the UST's income adjustments, and the reduced vehicle payment amounts as shown on the *Reaffirmation Agreements* and calculated by the court.

[16] *In re Bearup*, 10 A.B.R. 162, 170 (Bankr. D. Alaska 2011)(*citing In re McUne*, 357 BR 397, 399 (Bankr. D. Or. 2006)).

8

totality of circumstances surrounding the debtor's financial situation.[17] Section 707(b)(3) is written in the disjunctive, and the bankruptcy court may dismiss the case under either prong.[18] The UST has emphasized that dismissal is sought only under the totality of circumstances standard, and the court will restrict its analysis to that prong. As the movant, the UST bears the burden to prove abuse by a preponderance of the evidence,[19] but it is no longer necessary that she prove "substantial abuse" as previously required prior to the enactment of BAPCPA.[20]

The Bankruptcy Code does not define the phrase "totality of circumstances," nor does it indicate what factors should be considered in a court's review of a debtor's finances for abuse under § 707(b)(3)(B). However, it is well settled that pre-BAPCPA case law remains applicable,[21] and the parties agree that the factors set out by the Ninth Circuit in *In re Price*[22] are applicable here:

> (1) Whether the debtor has a likelihood of sufficient future income to fund a Chapter 11, 12, or 13 plan which would pay a substantial portion of the unsecured claims;
>
> (2) Whether the debtor's petition was filed as a consequence of illness, disability, unemployment, or some other calamity;

---

[17] 11 U.S.C. § 707(b)(3)(B).

[18] 11 U.S.C. § 102(5); *see also In re Oot*, 368 B.R. 662, 664 (Bankr. N.D. Ohio 2007)(*citing* § 102(5)); *In re Clark*, 2012 WL 1309549 at *1 (Bankr. N.D. Cal. Apr. 15, 2012).

[19] *In re Lamug*, 403 BR 47, 54-55 (Bankr. N.D. Cal. 2009); *see also In re Bearup*, 10 A.B.R. at 169.

[20] *In re Pak*, 343 B.R. 239, 246 (Bankr. N.D. Cal. 2006); *see also In re Hornung*, 425 B.R. 242, 248 (Bankr. M.D.N.C. 2010).

[21] *Ng v. Farmer (In re Ng)*, 477 B.R. 118, 126 (B.A.P. 9th Cir. 2012); *In re Henebury*, 361 B.R. 595, 604 (Bankr. S.D. Fla. 2007); *In re Pak*, 343 B.R. at 243.

[22] *Price v. United States Trustee (In re Price)*, 353 F.3d 1135 (9th Cir. 2004).

>   (3) Whether the schedules suggest the debtor obtained cash advancements and consumer goods on credit exceeding his or her ability to repay them;
>
>   (4) Whether the debtor's proposed family budget is excessive or extravagant;
>
>   (5) Whether the debtor's statement of income and expenses is misrepresentative of the debtor's financial condition; and
>
>   (6) Whether the debtor has engaged in eve-of-bankruptcy purchases.[23]

In discussing these factors under the pre-BAPCPA "substantial abuse" standard, the Ninth Circuit noted that the primary factor was "the debtor's ability to pay his debts as determined by the ability to fund a Chapter 13 plan," and that an ability to pay, standing alone, could justify dismissal.[24] The court further clarified, however, that such a finding would not *compel* dismissal, and that a finding of substantial abuse could be made under certain circumstances even if the debtor lacked an ability to pay.[25]

More recently, in *In re Ng*, the Bankruptcy Appellate Panel reviewed the *Price* factors in the context of § 707(b)(3)(B), and reiterated that the primary factor was the debtor's ability to fund a chapter 13 plan.[26] The ability to repay creditors "is a question of fact that requires a bankruptcy court to examine the debtor's actual income and expenses."[27] In determining

---

[23] *Id.* at 1139-40.

[24] *Id.* at 1140 (*citing Zlog v. Kelly (In re Kelly)*, 841 F.2d 908, 914 (9th Cir. 1988)).

[25] *Id.*

[26] *In re Ng*, 477 B.R. at 126.

[27] *Id.* (*citing Ross-Tousey v. Neary (In re Ross-Tousey)*, 549 F.3d 1148, 1162 (7th Cir. 2008)).

10

an ability to pay, the court may consider both the debtor's current and future circumstances,[28] including post-petition changes to a debtor's income or expenses.[29]

Before addressing the debtor's ability to fund a chapter 13 plan, the court feels that Debtor's circumstances implicate two of the other *Price* factors and merit comment. Debtor purchased two vehicles, and incurred over $60,000 in secured debt, within five months of his bankruptcy filing, and apparently well after he sought dissolution of his marriage.[30] While the vehicles were not technically purchased on the eve of bankruptcy, they suggest an excessive budget, or that Debtor made purchases which were beyond his ability to pay. Moreover, it is unclear why Debtor incurred secured debt on his estranged wife's behalf at the expense of his unsecured creditors. On the other hand, Debtor testified that he filed his petition as a result of financial troubles arising from his separation rather than in an effort to abuse the bankruptcy process. The UST does not contend Debtor has filed his petition in bad faith. Other courts have indicated that, aside from a debtor's ability to fund a chapter 13 plan, the *Price* factors implicate a bad faith filing under § 707(b)(3)(A) rather than abuse based on the totality of a debtor's financial situation under § 707(c)(3)(B).[31] This returns the

---

[28] *Id.* (*citing In re Hartwick*, 359 B.R. 16, 21 (Bankr. D.N.H. 2007)).

[29] *In re Pak*, 343 B.R. at 246-47; *see also In re Goble*, 401 B.R. 261, 276 (Bankr. S.D. Ohio 2009); *In re Henebury*, 361 B.R. at 611.

[30] Debtor valued the Ford F150 at $30,000, at the time of his bankruptcy filing. In other words, roughly five months after he purchased the vehicle he owed over $10,000 more than the collateral was worth. Similarly, the Buick Verano was valued at $20,000, and Debtor owed $25,540 on it when he filed his bankruptcy petition.

[31] *See, e.g., In re Pak*, 343 B.R. at 244.

11

discussion to the first *Price* factor: whether Debtor has a likelihood of sufficient future income to fund a chapter 13 plan which would pay a substantial portion of his unsecured claims.

At the hearing, the parties focused almost exclusively upon the calculation of Debtor's monthly disposable income, and, more specifically, his net monthly income in light of the potentially changing market for car sales in the Fairbanks area. His pay stubs demonstrate that his wages fluctuate widely from month to month. The UST attempts to solve this problem by deriving a monthly average from 17 months worth of paychecks ranging from $915.52 to $8,970.20. On the other hand, Debtor chooses to look only at the first three months of 2014 to argue that his average monthly gross income has fallen to $6,003.35. Neither party has presented the court with cases that address the calculation of monthly income in situations where a debtor's pay varies wildly.

The court finds the approaches advocated by each side to be unsatisfactory. While the 17 month analysis presented by the UST gives the longest historical comparison, it also blunts any emerging trend. Conversely, Debtor's suggestion that the court look only at the first three months of the year makes no sense given the evidence of two additional, and more timely, months of pay records.

Consistent with § 707(c)(3)(B)'s mandate to consider the totality of circumstances, the court elects to look at Debtor's average monthly income for the first five months of 2014, and to compare that with the average for the first five months of 2013, in an effort to ascertain any trends. Through that period, Debtor did not have any large paychecks in 2014

similar to the ones for $8,756, $8,505, and $5,138, that he received in March and April, 2013. Rather, his pay in 2014 ranged from $1,252.75 to $5,511.56. His gross wages totaled $38,287.19 between Janaury and May 2013, and $34,758.97 for the same period in 2014; or $7,657.44 in average gross monthly income for the first five months of 2013, and $6,951.79 in 2014. Debtor testified that his employer had forecast a decline in sales in 2014. The UST did not object to the testimony, and it is corroborated by Debtor's pay through the first five months of 2014.

Throughout the 17 months of pay records, Debtor's pay fluctuated widely, and it is certainly possible that Debtor may earn as much, if not more, in 2014 than he did in 2013. Yet, his estimate of future income was clearly accurate for the first five months of 2014. There are no allegations, much less evidence, of any manipulation of Debtor's pay in 2014. Therefore, the court concludes that Debtor has properly stated his projected current monthly income in *Amended Schedule I*. The court will calculate his gross wages at $7,000.

The UST presented compelling testimony that Debtor's calculation of payroll deductions in the rounded amount of $1,500 was excessive. However, the UST calculated a $195 reduction in the payroll deductions based upon estimated monthly wages of $7,687. The UST did not present evidence as to the appropriate adjustment necessary for monthly wages of $7,000. However, Debtor's pay advices were admitted into evidence, and include the taxes paid per paycheck. On average for the five months between January 1, 2014 and May 31, 2014, Debtor paid $1,319.54 in taxes per month. This court will use $1,320 as the

13

appropriate monthly payroll deduction for taxes, resulting in Debtor having $5,830 in monthly income net of taxes.[32]

Debtor's income, of course, is only half of the equation necessary to calculate his projected monthly disposable income. The dispute regarding Debtor's expenses focuses on the monthly payments on two vehicles. The UST contends the reduced loan payment on the F150 increases net disposable income. Debtor counters that, if the *Motion* is granted and his bankruptcy is dismissed, the reduced interest rates on the two loans will revert back to 15.25%, effectively negating his ability to make any payments to his creditors. He offers no authority for this contention. The court notes that the *Amended Reaffirmation Agreements*, by their terms, became effective when they were filed with the court.[33] Further, while these agreements give Debtor the right of rescission, a similar right is not provided to the credit union.[34] Given these express terms, the *Agreements* are enforceable, and it does not appear that the credit union may unilaterally avoid them if this case is dismissed. Moreover, because the court will provide Debtor with an opportunity to remain in bankruptcy by converting this case to chapter 13, such fears regarding the effect of this court's ruling may be unfounded. In any event, it would be premature to address this issue here.

---

[32] Debtor's paystubs list additional varying deductions: B/C Dep Care ($100 per pay period), United Way ($16 per pay period) and SPIFF (varying amounts). No evidence was presented at the hearing on these deductions, and Debtor did not include them in his *Amended Schedule I* calculation of monthly income. Given the lack of any explanation, and Debtor's exclusion of these items, the court likewise has excluded these deductions from its calculation.

[33] *See Amended Reaffirmation Agreements*, ECF No. 36 at 5 ¶6.a.ii; ECF No. 37 at 6 ¶6.a.ii.

[34] ECF No. 36 at 4 ¶5; ECF No. 37 at 5 ¶5.

14

Looking solely at the reduced payments on the two vehicle loans, Debtor now has more than $400 per month in disposable income that could fund a chapter 13 plan. Given Debtor's historical payroll deductions for taxes, Debtor has overstated the deductions by $180 per month. The adjustments to the vehicle payments and payroll deductions result in $635 in monthly disposable income.[35] A three year plan with monthly payments in that amount would generate $17,010 in plan payments for unsecured creditors.[36] Debtor lists his total unsecured debt at $43,122, which would result in a 30% distribution if all creditors timely filed claims.[37] Other courts have found the potential of payments within this range

---

[35] This calculation, in comparison to those of Debtor and the UST, is:

|  | Debtor | UST | Revised |
|---|---|---|---|
| Gross Monthly Income |  |  |  |
| Wages | $ 7,000 | $ 7,687 | $ 7,000 |
| Alaska PFD | $ 150 | $ 150 | $ 150 |
| Payroll Deductions | $ (1,500) | $ (1,305) | $ (1,320) |
| Net Monthly Income | $ 5,650 | $ 6,532 | $ 5,830 |
| Monthly Expenses | $ (5,617) | $ (5,195) | $ (5,195) |
| Net Monthly Disposable Inc. | $ 33 | $ 1,337 | $ 635 |

[36] Assuming that the secured debt on the vehicles is paid through a chapter 13 plan, as required under AK LBR 3015-1(b)(2), Debtor would make monthly plan payments of $635 together with the $990 monthly payments for the two vehicles, for 36 months, totaling $58,500 in plan payments, less $5,850 for trustee's commission, and $35,640 in payments to Credit Union 1 on the vehicles. This would leave $17,010 to be distributed to the general unsecured creditors, depending upon whether any attorney fees were approved. The UST argues that Debtor should fund a plan over five years, which would result in plan payments sufficient to pay all unsecured creditors in full. However, Debtor states that his current monthly income is below the applicable median family income, and the UST has not objected to this characterization. Accordingly, Debtor would only be required to make plan payments for three years. 11 U.S.C. § 1322(d)(2). Again, this presumes Debtor's household properly includes three persons.

[37] This percentage assumes allowed attorney's fees of $3,500 and costs of $350, based upon the "no look" fee and cost provisions found in AK LBR 2016-1(h)(2)[C].

15

to merit dismissal under the totality of circumstances analysis.[38] Compared to chapter 7, in which the unsecured creditors would receive nothing, a potential return of 30% constitutes a substantial payment. Because Debtor has sufficient monthly income to fund a substantial payment to his unsecured creditors, his chapter 7 filing constitutes abuse under the totality of circumstances pursuant to 11 U.S.C. § 707(b)(3).

## CONCLUSION

Debtor has properly stated his gross monthly income. However, in light of the evidence presented here, including Debtor's paystubs and the *Amended Reaffirmation Agreements*, the court finds that Debtor has overstated his payroll deductions and current monthly vehicle payments. With these adjustments, Debtor has sufficient disposable monthly income to fund a substantial payment to his unsecured creditors. This fact alone is sufficient to establish abuse under § 707(b)(3)(B).[39] A preponderance of the evidence establishes that relief under chapter 7 would be an abuse given the totality of circumstances of Debtor's financial situation. Therefore, the United States Trustee's *Motion to Dismiss*

---

[38] *In re Baeza*, 398 BR 692, 698 (Bankr. E.D. Cal. 2008) (debtor could make plan payments of $479); *see also In re Willingham*, 520 BR 818, 823-24 (Bankr. E.D. Cal. 2014)(abuse found where debtors' adjusted net monthly income, $491, exceeded the "presumption of abuse" threshold found in § 707(b)(2)(A)(ii)(l)); *In re Andersen*, 2009 WL 9085558 at *5 (Bankr. E.D. Cal. Jun. 18, 2009) (debtor's scheduled monthly net income of $195 would, alone, pay in excess of the amount that would trigger a "presumption of abuse" under § 707(b)(2), and with additional adjustments her net income could increase to $682). Pre-BAPCPA, the Ninth Circuit upheld a finding of "substantial abuse" where the debtor had monthly disposable income of $172, sufficient to pay 27% of her unsecured debt over three years. *Hebbring v. United States Trustee*, 463 F.3d 902, 908-09 (9th Cir. 2006).

[39] The court is also left with the clear impression that Debtor has purposefully chosen to pay for the support of his estranged wife and stepson at the expense of his creditors. While his efforts to provide support are laudable, it appears they are wholly voluntary. Debtor's somewhat vague testimony at the hearing indicated that no order had yet been entered in the dissolution proceeding that legally obligated him to make these substantial payments. His testimony further established that he created a secured obligation for his estranged wife's benefit – a new vehicle loan – several months after filing for dissolution.

16

(ECF No. 28) will be GRANTED unless Debtor voluntarily elects to convert his case to chapter 13 within fourteen (14) days of entry of this order. If the case is not so converted, the UST shall submit a proposed order dismissing this case.

DATED: January 22, 2015

BY THE COURT

 /s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge

Serve: J. Crawford, Esq.
T. Buford, Esq.
L. Compton, Trustee
U. S. Trustee
SVS